FILED

10/17/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0248

DA 21-0248

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 194

STATE OF MONTANA,

 Plaintiff and Appellee,

 v.

REGINA LEE THOMPSON,

 Defendant and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-16-408(B)
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

 For Appellant:

 Karl Pitcher, Attorney at Law, Missoula, Montana

 For Appellee:

 Austin Knudsen, Montana Attorney General, Bjorn Boyer, Assistant
Attorney General, Helena, Montana

 Travis Ahner, Flathead County Attorney, John Donovan, Deputy
County Attorney, Kalispell, Montana

Submitted on Briefs: May 17, 2023

Decided: October 17, 2023

Filed:

   _____
         Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Defendant Regina Lee Thompson appeals the January 8, 2021 Order denying her motion to suppress by the Eleventh Judicial District Court, Flathead County. We address:

> *Whether the District Court properly denied Thompson's motion to suppress evidence obtained during a probation home visit.*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In July of 2017, Regina Thompson was convicted of bail jumping in Flathead County and received a four-year deferred sentence. As part of her sentencing conditions, Thompson agreed to "make [her] residence open and available to an officer for a home visit or a search upon reasonable suspicion" and was prohibited from using "any device that would hinder an officer from visiting or searching [her] residence."

¶4 Thompson struggled to maintain contact with her probation officer. In January of 2019, Thompson stopped reporting completely. On May 6, 2019, after being unable to reach her by phone, Thompson's probation officer went to her home. Although he heard multiple voices inside the residence, he could not get anyone to come to the door. Based on these violations, the State filed a petition to revoke Thompson's deferred sentence, but the petition was ultimately dismissed.

¶5 On July 9, 2020, one of Thompson's neighbors reported that two individuals had been spray-painting stolen ATVs in the back of Thompson's property. Two days after this initial report, Flathead County Sheriff's Deputy Mandi Perry pursued two individuals on

ATVs, one of which had been spray-painted gold. Perry recovered the gold ATV when one of the individuals abandoned it and escaped on foot. A witness to the pursuit identified this person as Gavin Valentine, one of Thompson's known associates.

¶6 Perry contacted Flathead County Probation Officer David Edwards requesting assistance with contacting Thompson regarding the stolen ATVs and in the hope of locating Valentine. Although Edwards agreed to conduct a home visit, he clarified to Perry that he did not believe he had reasonable suspicion to conduct a probation search for contraband.

¶7 On July 16, 2020, Edwards, accompanied by Perry and some other sheriff's deputies, went to Thompson's residence to conduct a home visit. Thompson lived in a trailer with a covered exterior structure surrounding the door to the home. Edwards entered the exterior structure, repeatedly knocked on the trailer house door, but nobody responded. Edwards then "open[ed] the door a crack" and announced himself, after which Thompson came to the door. Edwards told Thompson that he was there to conduct a "routine home visit," and Thompson allowed the officers to enter her home.

¶8 Edwards asked Thompson if anyone else was present and Thompson advised that another individual was in one of the back rooms of the house. Edwards went to the back room with Thompson to account for everyone who was present. Meanwhile, Perry observed a methamphetamine pipe in plain view on a coffee table in Thompson's living room, just inside the main door to the home.

¶9 Prior to observing the meth pipe, Edwards was only doing a home visit, which he described as a "knock-and-talk," in which he does not conduct a search, but just "walk[s]

through [the home] and make[s] sure that" there are no "visible . . . violation[s]." But after observing the drug paraphernalia, Edwards believed he had reasonable suspicion to conduct a more thorough search. Upon explaining his intention to Thompson, she directed him to a dresser in her bedroom where Edwards located a "significant amount of methamphetamine."

¶10 The State petitioned to revoke Thompson's deferred sentence. Thompson moved to suppress the drugs which were found in her home, contending their discovery was the result of an unlawful search.

¶11 At the suppression hearing, Thompson's counsel introduced a picture of Thompson's trailer that depicted a "No Trespassing" sign abutting the exterior structure's door and questioned Edwards about his relationship with Thompson and his actions on the day at issue. Edwards testified that he had been Thompson's probation officer and had visited her residence many times. Regarding the July 16, 2020 home visit, Edwards could not recall seeing a "No Trespassing" sign and believed the exterior door was "not really a door as much as—I recall maybe it might [have] even [been] a piece of plywood . . . it's more of a shed covering than an outside door." Edwards pointed out that he visited Thompson's home in July, but the picture depicted the trailer surrounded by snow. Throughout the hearing, Edwards reiterated that he did not believe he had reasonable cause to search Thompson's house when he initially conducted the visit, but he could conduct a routine home visit to see whether she was complying with her probation conditions and whether she had any information about the stolen vehicles. Deputy Perry also corroborated

4

Edwards' testimony, acknowledging that Edwards had told her prior to the visit that they did not have reasonable cause to search Thompson's home.

¶12   The District Court denied Thompson's motion to suppress, finding:

> I've been to residences, we probably all have at some time during our lifetime, that have that outside—they have a porch with an outside door and then either a porch or mudroom, and if you knock on the outside door it's hard to hear from the inside.  So sometimes you knock on that outside one and then depending on the circumstances, whether I know the person or not . . . I've at times opened and gone into the porch area and then knocked on the interior door to see if that raised a response.
>
> In going back and reviewing, there was an earlier report of violation, it was in a proceeding that was ultimately dismissed, but the substance of that one was that they had problem[s] getting her to come to the door.
>
> I don't think in this instance that Officer Edwards acted in any way unreasonably, I think that pushing the door open and calling for her and then having her come forward was fine. . . . I think that by responding when he hailed her from the door—albeit the one that he had opened—that he did not violate the reasonable protocols for a probation home visit.

## STANDARDS OF REVIEW

¶13   "We review a district court's denial of a motion to suppress to determine whether the court's findings are clearly erroneous and whether those findings were correctly applied as a matter of law." *State v. Conley*, 2018 MT 83, ¶ 9, 391 Mont. 164, 415 P.3d 473.  "A finding is clearly erroneous if it is not supported by substantial evidence, if the lower court has misapprehended the effect of the evidence, or if our review of the record leaves us with the firm conviction that a mistake has been made." *Conley*, ¶ 9.  "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence, but may be somewhat less than a

preponderance." *State v. Brave*, 2016 MT 178, ¶ 6, 384 Mont. 169, 376 P.3d 139 (internal quotations and citation omitted).

**DISCUSSION**

*Issue: Whether the District Court properly denied Thompson's motion to suppress evidence obtained during a probation home visit.*

¶14 Thompson claims that Officer Edwards conducted an unlawful search of her home, violating her right to be free from unreasonable searches and seizures protected by the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution. Though she acknowledges that as a probationer she has a diminished expectation of privacy, Thompson argues that she had an actual expectation of privacy in her home and in the exterior structure which Edwards violated when he entered the exterior structure and opened the trailer house door. Thompson also asserts that Edwards lacked reasonable cause to conduct a probationary search in part because he did not know whether Thompson was at her residence. As a result, she concludes that the District Court should have excluded the evidence obtained from the search at the probation revocation hearing.

¶15 The Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution guarantee people the right to be free from unreasonable searches and seizures. This protection is augmented by Article II, Section 10 which grants Montana residents an express right to privacy against government intrusion. Mont. Const. art. II, § 10. The express right to privacy works in tandem with Article II, Section 11, to

expand where people have reasonable expectations of privacy that are protected from unreasonable government intrusions. *State v. Peoples*, 2022 MT 4, ¶ 13, 407 Mont. 84, 502 P.3d 129.

¶16 A "search" occurs when the government substantially infringes or intrudes into an area to gather evidence or information where a person has a reasonable expectation of privacy. *Peoples*, ¶ 14. A government search without a warrant is per se unreasonable unless the search falls within one of the exceptions to the warrant requirement. *Peoples*, ¶ 15. To determine whether an unreasonable search has occurred, the court considers three factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion. *State v. Moody*, 2006 MT 305, ¶ 18, 334 Mont. 517, 148 P.3d 662.

¶17 A probationer subject to state supervision has a diminished actual expectation of privacy as determined by his sentencing conditions. *State v. Therriault*, 2000 MT 286, ¶ 49, 302 Mont. 189, 14 P.3d 444; *see Conley*, ¶ 18 ("The judgment imposing a deferred sentence is a form of contract between the court and the probationer, eliminating certain privacy expectations; the probationer is aware that his activities will be scrutinized."). As part of a probationer's sentencing conditions, a probationer may agree to allow probation officers to conduct home visits. *Moody*, ¶ 19. A home visit is when "the probation officer stops by the probationer's home to determine whether the individual is abiding by the conditions of his or her probation," without going through the probationer's belongings or opening enclosed areas such as drawers, closets, or cabinets. *Moody*, ¶¶ 16, 24. Once a

7

probationer is made "unambiguously aware" of this express condition, she "does not have an actual expectation of privacy that would preclude home visits." *Moody*, ¶ 19. Because a probationer does not have an actual expectation of privacy, a home visit does not constitute a search. *Moody*, ¶ 24.

¶18 Based on the hearing testimony, the District Court found that Edwards conducted a home visit at Thompson's residence. The uncontroverted facts regarding the visit are these: (1) Thompson agreed to make her home available for home visits; (2) Thompson had a history of not answering her door or making her home available for probation officers; (3) Edwards repeatedly testified that he went to Thompson's home with the express purpose of conducting a home visit and that he did not have reasonable cause to search her home; (4) Edwards entered the exterior structure based on his experience that residents with similar structures do not hear knocks[1] on exterior doors and that the door was more like a "shed covering than an outside door"; (5) Edwards knocked multiple times on the trailer house door; (6) Edwards cracked the door open solely to announce himself; (7) Edwards did not enter Thompson's home until she came to the door; (8) upon coming to the door, Thompson allowed Edwards and the sheriff's deputies into her home; and (9) neither Edwards, nor the deputies, observed the drug paraphernalia until they had entered the home. Viewing the totality of the circumstances, including Edwards' knowledge of, and history with, Thompson, and the degree of flexibility a probation officer may exercise when

---

[1] Edwards could not recall whether he knocked on the exterior structure's door, but if there had been a door he was "sure [he] knocked on the outside door just out of normal behavior on [his] part."

exercising their supervisory powers, there is substantial evidence to conclude Edwards properly conducted a home visit. *Conley*, ¶ 18 (holding that a "probation officer is granted a degree of flexibility to determine how to exercise his or her supervisory powers" (internal quotations and citation omitted)).

¶19   Thompson argues that "a home visit requires a probationer to take affirmative actions to make [the probationer's] home available for home visits." Thompson argues that Edwards' actions could not have constituted a home visit because Thompson did not "welcome [Edwards] into her home" or otherwise take any actions to make her home available. Thompson expresses concern that a home visit gives officers "carte blanche to *enter* [probationers'] homes." To be clear, it does not. The Montana Constitution, our jurisprudence, and the probation conditions themselves protect probationers from such intrusions. *See Therriault*, ¶¶ 54-55 (explaining that the probation officer's "physical presence inside [the probationer's] residence was a search and required the officer to have made a reasonable request of the probationer according to the probationer's probation conditions.").

¶20   The fundamental infirmity of Thompson's carte blanche home visits argument is that it is not what occurred in this case. "Determining the existence of reasonable cause to conduct a probationary search involves a factual inquiry based on the totality of the circumstances." *State v. Smith*, 2008 MT 7, ¶ 15, 341 Mont. 82, 176 P.3d 258. In this case, the totality of the circumstances are that when Thompson failed to respond to Edwards' repeated knocks at the door, Edwards "cracked [the door] open" to verbally call for her

because she had a history of failing to answer the door when home visits were conducted. After Edwards called for Thompson, she came to the door and allowed him, along with the other officers, into her home, at which point the methamphetamine pipe was observed in plain view. If Thompson had declined to come to the door after Edwards verbally called for her, and Edwards entered the home anyway, Thompson's argument may be well-taken. Similarly, if Edwards had observed the drug paraphernalia through the crack in the door while calling for Thompson and he engaged in the search on that basis, Thompson's argument may be well-taken. But those are not the circumstances of this case. Edwards did not enter Thompson's home until after she came to the door and allowed him inside, at which time Deputy Perry observed the methamphetamine pipe in plain view.

¶21 A home visit is not a search. *Moody*, ¶ 24. However, "a home visit has the potential to turn into a search pursuant to an officer's plain view observations . . . [when] there is reasonable cause to engage in a search." *Moody*, ¶ 24. That is what occurred here. After being allowed into Thompson's home, what began as a home visit turned into a search pursuant to the plain view observation of drug paraphernalia which, in turn, provided reasonable cause for the search.

## CONCLUSION

¶22 We affirm the District Court's denial of Thompson's motion to suppress evidence obtained during a home visit.

/S/ JAMES JEREMIAH SHEA

10

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JIM RICE


Justice Laurie McKinnon dissenting.

¶23   I dissent.   The plain terms of the Judgment and Sentence required Thompson's probation officer to have reasonable suspicion before making a home visit and conducting a search.   As Edwards plainly admitted he did not have reasonable suspicion, he had no authority under the terms of the sentence to conduct a home visit and to open Thompson's front door without her permission.   Edwards' actions constituted a warrantless entry of Thompson's home, which was per se unreasonable and not subject to any exception.

¶24   Two conditions of Thompson's sentence are relevant.   They provide:

> 2.   The Defendant must obtain prior written approval from his/her supervising officer before taking up residence in any location.   The Defendant shall not change his/her place of residence without first obtaining written permission from his/her supervising officer or the officer's designee. *The Defendant must make the residence open and available to an officer for a home visit or for a search upon reasonable suspicion.*   The Defendant will not own dangerous or vicious animals and will not use any device that would hinder an officer from visiting or searching the residence.
> (Emphasis added).

> 8. *Upon reasonable suspicion that the Defendant has violated the conditions of supervision, a probation and parole officer may search the person, vehicle, residence of the Defendant, and the Defendant must submit to such search.*   A probation and parole officer may authorize a law enforcement agency to conduct a search, provided the probation and parole officer determines reasonable suspicion exists that the Defendant has violated the conditions of supervision.
> (Emphasis added).

¶25 Clearly, a probation officer can approach a residence and knock on the door without reasonable suspicion, but the only way law enforcement can pursue a home visit in the absence of a probationer's consent is to have reasonable suspicion that the probationer is violating the terms of probation. Here, Edwards did not have reasonable suspicion that Thompson was violating any term of her probation so he had no basis to pursue a home visit, breaching her home, and opening Thompson's front door. If Thompson refused to allow Edwards to enter her home, then she could be held accountable through a petition to revoke because she failed to "make the residence open and available to an officer for a home visit . . . ." (Condition 2). However, when Edwards pursued the home visit by opening Thompson's front door, he conducted an unlawful search without reasonable suspicion.

¶26 As part of Thompson's 2017 deferred sentence for bail jumping, she was required to "make the residence open and available to an officer for a home visit or for a search upon reasonable suspicion." In July of 2020, men were seen near Thompson's trailer home repainting and changing the identities of some four-wheelers. The men were pursued by police and one of them escaped. In the hope that the escaped man might have fled to Thompson's trailer, Officer Perry spoke with Thompson's probation officer, Edwards. Perry requested that Edwards make contact with Thompson. Edwards informed Perry that they lacked reasonable suspicion and that they could not simply walk into Thompson's house.

12

¶27 However, Edwards agreed to attempt to conduct a home visit. Thompson lived in a trailer with an exterior room which acted as a mudroom. Edwards and Perry showed up at Thompson's property without having called in advance or given her any indication that they would be stopping by and without any knowledge that she was home. Edwards testified that he believed he knocked on the exterior mudroom before entering but could not be sure. However, whether he did or did not knock, Edwards did open the door and enter the mudroom without Thompson's consent. Edwards then knocked on the interior door and after not hearing a response opened the door and called for Thompson. It was only after Edwards had already opened the door, that Thompson came to the door and made contact with him and Perry.

¶28 Montana's Constitution establishes a fundamental "right to privacy, subject to government infringement only upon 'showing of a compelling state interest.'" Mont. Const. art. II, § 10; *State v. Staker*, 2021 MT 151, ¶ 8, 404 Mont. 307, 489 P.3d 489. "The Fourth Amendment to the United States Constitution and Article II, [S]ection 11, of the Montana Constitution both protect individuals from unreasonable government searches and seizures." *State v. Hoover*, 2017 MT 236, ¶ 14, 388 Mont. 533, 402 P.3d 1224. Protecting individuals from unreasonable government intrusion and interference is the fundamental purpose of Article II, Sections 10-11. *Staker*, ¶ 9. "Together, Article II, Sections 10-11 provide a heightened state right to privacy, broader where applicable than the privacy protection provided under the Fourth and Fourteenth Amendments to the United States Constitution. *Staker*, ¶ 9 (citing *State v. Goetz*, 2008 MT 296, ¶¶ 13-14, 345

13

Mont. 421, 191 P.3d 489). Homes in particular "have special protection in search and seizure law." *State v. Graham*, 2004 MT 385, ¶ 20, 325 Mont. 110, 103 P.3d 1073.

¶29 Thompson argues that to allow this kind of action by a probation officer as part of a home visit gives them "carte blanche to *enter* [probationers'] home[s]." I agree. The Court responds that "[t]o be clear, it does not." The Court then tries to distinguish *Therriault*. In *Therriault*, we held the probation officer's "physical presence inside [the probationer's] residence required that he make a reasonable request prior to entering" and absent one of the "few specifically established and well-delineated exceptions" entry into the home is unacceptable. *Therriault*, ¶¶ 53-54. The Court reasons this case is different because Thompson failed to answer the door when she was home. The Court strays from the Judgment setting forth the conditions of probation, and from our jurisprudence, when it holds Edwards was justified to continue with his home visit into a protectable area of privacy by opening Thompson's door to call for her. The Court further reasons that because Thompson came to the door after Edwards opened it, the action of opening the door somehow did not reach the level of a warrantless entry but, instead, morphed back into a home visit. The Court next extrapolates that Thompson permitted the home visit to proceed and thus allowed Edwards, from his miniscule vantage point, to see contraband. The Court's analysis ignores the facts, basic Fourth Amendment jurisprudence, and Montana's right to privacy. At the time Edwards opened Thompson's front door to enter her home under the pretense of conducting a home visit, Thompson had no choice but to recognize his presence and, as a probationer, felt compelled to allow him to enter. Law enforcement

14

had not contacted her in advance, there was no noise coming from within the home, and there was no movement within the house. Thompson thus gave no indication that she was home for purposes of a home visit. Until Edwards opened her door, Thompson could continue to maintain she was not home. While Thompson was obligated under the terms of the Judgment to make her residence available for a home visit, the remedy was not an impermissible entry into her home; rather Edwards had at his disposal a revocation petition based on Thompson failing to make her home available for a home visit.

¶30 The Court's decision today creates a potentially serious issue for the future of Montana's right to privacy. Under the Court's analysis, probation officers in the future can open a probationer's door if they fail to answer a knock. Although, hopefully, if the probationer is not there, the probation officer will close the door and leave with no consequence. But judicial review of searches is fact-intensive, and there will always be new facts and arguments made to justify the opening of a probationer's door where there has been contraband found. Concomitantly, if the probationer is there, then the probationer should have answered the door and the probation officer is now free to enter. In the end, as here, contraband eventually discovered will be used to justify the warrantless intrusion and used against a probationer.

¶31 Both the Court and the District Court focus on facts that minimize the warrantless intrusion, such as that Edwards only slightly opened the door, what Edwards saw once he opened the door, that Thompson was not in the habit of answering her door in the past for prior visits from Edwards, and that Thompson should have answered Edward's initial

knock. All this obfuscates the fact that when Edwards opened Thompson's door, his entry constituted a breach of Thompson's privacy in her home, was warrantless, and Edwards lacked reasonable suspicion. Edwards breached Thompson's right of privacy with the hope that he could uncover incriminating information, either about Thompson's violation of the law or the theft of several four-wheelers. Thompson—even though she was a probationer—had a protectable, albeit limited, reasonable expectation of privacy in her home. When Edwards opened Thompson's door without her permission and intruded into her home without reasonable suspicion, he violated Thompson's right to be secure from a per se unreasonable warrantless search. Our case law demands nothing less.

¶32    The Court can reason about the amount Edwards opened the door and what he could see from the partially opened door, but the simple fact is that Edwards admitted to opening the door and peering into Thompson's home. Once the door was opened—however slight it may have been—the sanctity of Thompson's home was breeched and a warrantless search lacking reasonable suspicion occurred. A warrantless search which falls outside the narrow range of exceptions to the warrant requirement is "per se unreasonable under the Fourth Amendment and Article II, Section 11 of the Montana Constitution . . . ." *Peoples*, ¶ 16. The facts in this case do not support a finding that there was an exception to the warrant requirement justifying a search of Thompson's home. The search was per se unreasonable. As this Court held in *Therriault*:

> The State in this instance, . . . misconstrues the source of Therriault's 'actual expectation' of privacy by characterizing him as an 'inmate.' Therriault's privacy expectation, however limited, is derived directly from the court's conditions of his probation, which expressly provide that he would submit

his residence 'to search at any time by lawful authorities *upon reasonable request* of his Probation Officer.' This condition is coupled with the DOC's Rule 20.7.1101(7) 'reasonable cause' standard, which is necessarily incorporated by reference, pursuant to § 46-18-801, MCA. Thus, Therriault could expect that an intrusion into the privacy of his home would not occur unless McCarty had reasonable cause and first posed a reasonable request. (Emphasis in original).

*Therriault*, ¶ 48. As a society, "we have accorded discretion to the judiciary to determine the necessary and proper parameters of a particular probationer's 'conditional liberty,' within the prescribed boundaries of our federal and state constitutions, which in turn establish the probationer's limited expectation of privacy." *Therriault*, ¶ 49. Here, Thompson's privacy expectation was defined by the Judgment which provided Thompson must make her residence available for a "home visit or for a search upon reasonable suspicion." The undisputed fact is that Edwards knew he did not have reasonable suspicion and conveyed this information to law enforcement.

¶33 I would reverse, as I believe Edward's actions constituted an unreasonable search and that fruits of that search should have been suppressed. The Court's decision dilutes Montana's right of privacy, which still apply to a probationer's limited expectation of privacy. For these reasons, I respectfully dissent.

/S/ LAURIE McKINNON

Justices Ingrid Gustafson and Dirk Sandefer join the Dissent of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

17